# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

AARON GUIDRY ET AL                CASE NO. 6:18-CV-01232

VERSUS                            JUDGE SUMMERHAYS

TERESA ELBERSON ET AL             MAGISTRATE JUDGE HANNA


## REPORT AND RECOMMENDATION

Currently pending are the Joint Motion to Dismiss [Rec. Doc. 96], filed by the defendants Joel Robideaux, in his official capacity as Mayor-President of Lafayette City-Parish Consolidated Government, and Teresa Elberson, Director of the Lafayette Public Library; and the Motion to Dismiss [Rec. Doc. 111], filed by Teresa Elberson, Director of the Lafayette Public Library (the "Library").[1] Both motions have been referred to the undersigned for the issuance of a report and recommendation. [Rec. Doc. 113].

During the hearing held on October 16, 2018, the undersigned ordered the parties to brief the issue of whether or not the remaining plaintiffs, Aaron Guidry,

---

[1] Previously-named plaintiffs Joan Grace Harley, Whitney Kohl, and Rich Penkoski, as well as previously-named defendants John Bel Edwards, Jeffrey Martin Landry, and Stuart R. Shaw, in their capacities as the Governor of Louisiana, Attorney General of Louisiana, and Clerk of Court for Red River Parish, respectively, have all been dismissed. [*See* Rec. Doc. 100]. This Court also recognizes that, in response to the plaintiffs' "Notice of Non-Suiting . . . Against the Mayor if . . . the Mayor is not a Necessary Party" [Rec. Doc. 85], the defendants submit that the only appropriately named defendant for the relief sought is Robideaux, in his official capacity as the Mayor-President of the Lafayette City-Parish Consolidated Government. *See* Rec. Doc. 110.

John Gunter, Jr., and Mark Christopher Sevier, have standing, as raised in the above-cited motions.[2] [Rec. Doc. 100]. Although untimely and in excess of the allowable page limit, the plaintiffs filed briefs [Rec. Docs. 114, 116],[3] to which the defendants filed a joint response [Rec. Doc. 118]. Considering the record, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motions [Rec. Docs. 96, 111] be GRANTED insofar as the plaintiffs' claims should be dismissed without prejudice for lack of standing.

## BACKGROUND

This case was commenced on September 18, 2018, with the filing of a complaint and motions for preliminary and permanent injunctions, later amended, through which the plaintiffs challenge the Library's decision to host a "Drag Queen Story Hour" event ("DQSH") for children.[4] Specifically, the plaintiffs allege that

> [t]he Library's partnership with non-secular organizations, like Delta Lambda Phi, to host authorize, permit, sponsor, pay-for, promote, feature, display, favor, respect, and endorse [DQSH] at the public library for 3 to 6 year olds in a non-designated public forum . . . violates the Establishment Clause of the First Amendment to the United States Constitution and 42 U.S.C. § 1983, while also managing to be illegal

---

[2] All three of the remaining plaintiffs appear pro se. Although Mr. Sevier purports to be an attorney, he is not admitted to practice in this district, and as far as this Court is aware, is not currently eligible to practice anywhere. During the hearing held on October 16, 2018, the undersigned advised Mr. Sevier that he may not represent other parties in this litigation. [*See* Rec. Doc. 94].

[3] Each of the plaintiffs also filed declarations in support of the standing briefs [Rec. Docs. 115, 116-2, and 117], and for purposes of the instant recommendation, the plaintiffs also jointly filed a response in opposition to the motion to dismiss, in which they direct the Court's attention to their standing briefs referenced herein. [*See* Rec. Doc. 120, pp. 1-2].

[4] The plaintiffs also sought and were denied a temporary restraining order. [Rec. Docs. 22, 30].

> under [Louisiana's Revised Statute] § 14:91.11[, which prohibits *inter alia* the exhibition or distribution of material harmful to minors.][5]

At the time this case was filed, DQSH was scheduled to take place on October 6, 2018; however, to date, and in light of this litigation, the planned DQSH has not occurred.[6] The plaintiffs "seek a preliminary and permanent injunction to enjoin the Library from (1) partnering with non-secular organizations to host [DQSH] and from (2) hosting [DQSH] in a public facility for minors."[7]

The plaintiffs purport to be, *inter alia*, members of "the Special Forces of Liberty and De Facto Attorney Generals;" "card carrying members of the Lafayette Public Library;" "residents of Lafayette Parish or they do substantial work there;" "special taxpayers" of Louisiana; and "non-observers of the religion of Secular Humanism," which the plaintiffs define as "postmodern western moral relativism and expressive individualism."[8] The plaintiffs claim that the Establishment Clause prohibits the Library, as a publicly funded government actor, from partnering with Delta Lambda Phi to host DQSH, because doing so would "excessively entangle the government with the religion of Secular Humanism."[9] By hosting DQSH, the

---

[5] *See* Rec. Doc. 93, p. 15. Earlier versions of the complaint and injunctive motions, in original and amended forms, were stricken from the record [*see* Rec. Doc. 100, pp. 2-3 (striking Rec. Docs. 1, 5, 21, 22, 69, and 77)]. At this stage in the proceedings, the operative complaint and motions for injunctive relief may be found at Record Document Nos. 93, 101, and 102.

[6] *See* Rec. Doc. 118, p. 9.

[7] Rec. Doc. 93, p. 15, ¶ 19.

[8] Rec. Doc. 93, p. 2; pp. 15-16, ¶ 20; and p. 25, ¶ 51.

[9] Rec. Doc. 93, p. 2; p. 5, ¶ 7; p. 7, ¶ 8; and pp. 7-8, ¶ 10.

plaintiffs allege that the taxpayer-funded Library seeks "to communicate to impressionable minors, to the Plaintiffs, and to all Christians in Louisiana that Secular Humanism as advocated by the LGBTQ denomination is the favored religion of the Library, Louisiana, and the United States," in violation of Library policy and the United States Constitution.[10]

The plaintiffs further allege that DQSH "does not just involve 'religious speech,' it involves harmful unprotected obscene speech that violates La. [R.S.] § 14:91.11[,]" with the goal of "indoctrinat[ing] minors to non-secular ideology that is 'immoral, indecent, lewd, and obscene.'"[11] They claim that DQSH "seeks to seduce minors into cultivating sympathy for or . . . adopting the LGBTQ lifestyle[.]"[12] According to the amended complaint, "the books that were chosen to be read by biological adult males dressed up as females to children were selected by [the Library] . . . [and] amount to propaganda calculated to promote the religion of Secular Humanism[.]"[13] Thus, the plaintiffs' chief concerns regarding DQSH center around what they perceive to be the Library's endorsement of "LGBTQ ideology"

---

[10] Rec. Doc. 93, pp. 12-13, ¶ 15; *see also* Rec. Doc. 93, p. 16 (DQSH "has nothing to do with 'diversity' and 'tolerance' but with brainwashing the children of Lafayette to a religious worldview that is destructive, dishonest, desensitizing, dehumanizing, depersonalizing, deranged, and dangerous.").

[11] Rec. Doc. 93, pp. 13-14, ¶ 17.

[12] Rec. Doc. 93, p. 23, ¶ 45.

[13] Rec. Doc. 93, p. 22, ¶¶ 39-40. Though inconsequential, this Court notes that the plaintiffs' amended pleadings repeatedly refer to the targeted age group as "3 to 6 year olds," while their standing briefs state that DQSH targeted "2 to 10 year olds." *See, e.g.,* Rec. Doc. 114, p. 11.

and "the religion of Secular Humanism," both of which the plaintiffs find to be offensive and "dangerous."[14]

### CONTENTIONS OF THE PARTIES REGARDING PLAINTIFFS' STANDING

All three plaintiffs claim to be "taxpayers of Lafayette, who use the [L]ibrary as a resource to write secular tax legislation crafted to protect children from sexual exploitation and human trafficking and to restore Constitutional order."[15] Alleging that they "pay and will continue to pay taxes of every kind in Lafayette," the plaintiffs rely on "their taxpayer status capacity," in order to seek an injunction "to stop the government actors from excessively entangling the government with the religion of Secular Humanism."[16]

The amended complaint also alleges the following facts as to each of the three named plaintiffs. Plaintiff Guidry "has lived and worked in Lafayette Parish County (sic) for decades[,]" "has visited the [Library]" since he was a child, and "is deeply offended" by the Library's decision to "host the [DQSH] for [c]hildren[.]"[17] Plaintiff Sevier is "a seasoned whistleblower who has been the target of countless reprisal campaigns conducted by Secular Humanist Democrats in office" and claims that he "is offended [by] and objects to the Library's partnership with non-secular

---

[14] *See* Rec. Docs. 93, 101, 102, 114, 115, 116, and 117, *passim.*
[15] Rec. Doc. 93, p. 24, ¶ 50.
[16] Rec. Doc. 93, p. 25, ¶ 51.
[17] Rec. Doc. 93, pp. 16-17, ¶ 21; *see also* Rec. Doc. 93, pp. 25-26, ¶¶ 14 (sic) and 53.

organizations to host the [DQSH]."[18] Mr. Sevier further claims that, in addition to working "directly" with Louisiana legislators on various issues, he "works out of the Lafayette Special Forces of Liberty Office and uses the Library for secular reasons."[19] Plaintiff Gunter, who is sometimes referred to in the amended complaint as "Plaintiff SGM," is alleged to be an "aggressive lobbyist," who likewise "uses the Library for secular reasons and is offended by the intended exhibition and display that the Library intends to regularly put on."[20]

In their court-ordered briefs, the plaintiffs argue that they have standing because they: have library cards; use the Library to borrow books, rent materials, write tax legislation, and pay for printing and late fees;[21] have set up and attended meetings at the Library; have been exposed to, and offended by, DQSH promotional materials and media; have filed formal complaints against the DQSH, pursuant to Library guidelines; are personally offended by the Library's endorsement and sponsorship of the DQSH; and pay sales tax "through their use of the Library" and in Lafayette.[22] As to the final assertion regarding their taxpayer status, the plaintiffs allege that the Library special-ordered the DQSH books with taxpayer dollars; promoted the DQSH on websites funded by taxpayers; and used taxpayer dollars to

---

[18] Rec. Doc. 93, p. 17, ¶ 22.
[19] Rec. Doc. 93, p. 18, ¶ 22.
[20] Rec. Doc. 93, p. 1 and p. 18, ¶ 23.
[21] Sevier's Declaration states: "I have put $10.00 on [a library] card and spent it on printing at the Lafayette Public Library." [Rec. Doc. 104, p. 1, ¶ 2].
[22] Rec. Doc. 114, pp. 15-16; Rec. Doc. 116, pp. 7-9.

create a special flyer for the DQSH.[23] "As taxpayers, the [p]laintiffs do not want themselves, their children, or other children exposed to the offensive exhibition sponsored and promoted by the Library . . . to elevate the religion of Secular Humanism over non-religion."[24]

Additionally, the plaintiffs allege that they have a "residence near the Library and commercial leases" and that "some of the [p]laintiffs have children, and they do not want their children to encounter the event or any evidence that the Library has endorsed the event."[25] As to the former, Mr. Guidry advised the undersigned, under oath in open court on October 16, 2018, that he is a resident of Scott, Louisiana, in Lafayette Parish. Although all named plaintiffs had theretofore claimed Mr. Guidry's residential address as their own, he testified that no other plaintiff had ever lived with him at that address.[26] The record contains copies of residential and commercial leases, one version of which is signed by Mr. Sevier as lessee and unsigned by any lessor, and a later-filed version of which purports to be signed by a lessor and also contains a hand-written addition of Mr. Gunter's name, as an additional lessee.[27] As to the latter claim regarding the plaintiffs' children, Mr. Guidry testified on October 16, 2018, that he has no children and, as far as this Court

---

[23] *Id.*
[24] Rec. Doc. 114, p. 13.
[25] Rec. Doc. 114, p. 16; Rec. Doc. 116, pp. 7-9.
[26] When asked whether he knew where the other plaintiffs resided, Mr. Guidry testified that he believed that Mr. Sevier lives in Alabama and did not know where Mr. Gunter resides.
[27] *See* Rec. Docs. 104-1, pp. 1-10; and 116-1, pp. 10-19.

is aware, the record contains no indication that Mr. Gunter has any children. Although Mr. Sevier repeatedly references his children throughout the filings herein, there is no indication that his children reside in Lafayette or even Louisiana, or that any of his children have ever visited the Library. Moreover, the defendants have attached a complaint and declaration recently filed in a strikingly similar case in the Southern District of Texas, in which Mr. Sevier states that his son resides with the child's mother in Houston, Texas.[28]

In both their amended complaint and their standing briefs, the plaintiffs rely heavily on their status as taxpayers, or payers of sales tax, in order to establish standing. They argue that "[b]ecause the [p]laintiffs or their authorized agents are card carrying members of the Library and because they pay sale[s] tax in the city on an ongoing basis, they have enough to assert taxpayer standing."[29] In addition, the plaintiffs claim to be "'super tax payers,' with an 'extra' logical nexus to the Library because they are part of a lobbying team that writes tax legislation for [Louisiana,]" some of which "will generate millions of dollars annually," and they do not want the tax dollars that they pay or generate to go "towards the Library's partnership, endorsement, promotion, and authorization of [DQSH] for children."[30]

---

[28] *See* Rec. Docs. 118-3, p. 4, ¶ 13 (SDTX declaration) and 118-2 (SDTX complaint).
[29] Rec. Doc. 114, p. 16.
[30] Rec. Doc. 114, p. 17.

Similarly, in an effort to address the traditional standing requirements, the plaintiffs claim to have suffered an "injury in fact," because "they intend to continue to use the Library and the Library intends to regularly sponsor [DQSH] with its stamp of approval at the taxpayers' expense."[31] Essentially, the plaintiffs argue that their taxpayer status—which includes payment of sales taxes in Lafayette and "through their use of the Library," as well as their self-proclaimed status as "super tax payers"—is sufficient to satisfy the injury requirement, given that the Library is a "public taxpayer funded facility . . . with librarians whose salaries are paid for by the taxpayers[.]"[32] In the alternative, because this case is of such significant "national interest," the plaintiffs invite the Court not to engage in a rigid legal analysis of the standing requirements.[33]

On the other hand, attached to the defendants' standing brief is an affidavit from Ms. Elberson, in her capacity as the Director of the Library, which contains the following statements, in pertinent part. Mr. Guidry obtained a Library card on September 16, 2018; Mr. Sevier obtained a Library card on October 16, 2018; and there is no record of any Library card being issued to Mr. Gunter.[34] Ms. Elberson

---

[31] Rec. Doc. 114, p. 14.

[32] Rec. Doc. 114, pp. 23 and 15-19.

[33] *See* Rec. Doc. 114, pp. 21-28.

[34] Rec. Doc. 118-1, p. 1. This Court notes that, based on these dates, Mr. Guidry obtained a library card two days prior to filing this lawsuit, while Mr. Sevier obtained a library card on the same date of this Court's October 16, 2018 hearing, during which the undersigned inquired as to Mr. Guidry's status as a library-cardholder, and one day prior to the filing of Mr. Sevier's declaration [Rec. Doc. 104], in which he claimed to also be a library-cardholder.

states that "approximately ninety-eight percent (98%) of Library funding is received from three (3) parish wide ad valorem taxes and the remaining two percent (2%) of Library revenues come from fines, print revenues and donations."[35] Based on the Library's records, the only "formal, completed request form for a meeting room" ever submitted by any of the named plaintiffs or their organizations, was dropped off by Mr. Guidry, on behalf of Warriors for Christ and Special Forces of Liberty, on September 28, 2018.[36] It is undisputed that this request was granted and a meeting room was used by the plaintiffs on October 6, 2018.[37]

Ms. Elberson's affidavit goes on to explain the difference in the Library's procedures for scheduling a meeting room versus a "program," such as DQSH. "[P]roposals for programs may be discussed with a committee or they may originate with one person, but all programs are submitted electronically to the Head of Programming and are scheduled two (2) months in advance in order to be included on the Library's calendar and published in the Library's newsletter[.]"[38] "[A]ll programs of the Library are held in meeting rooms[,]" and "all proposed programs must be consistent with Library guidelines and procedures and must be subject and content appropriate."[39] Insofar as the DQSH was originally scheduled to take place

---

[35] Rec. Doc. 118-1, p. 1.
[36] Rec. Doc. 118-1, pp. 1-2. This Court notes that this date is ten days after this lawsuit was filed.
[37] Rec. Doc. 118-1, p. 1; Rec. Doc. 93, pp. 25-26.
[38] Rec. Doc. 118-1, p. 2.
[39] Rec. Doc. 118-1, p. 2.

at the Library on October 6, 2018, it "was to take place in a meeting room . . . rather than the commons area of the Library," and "should [DQSH] take place it will be held in a meeting room . . . rather than in the commons area of the Library."[40] Finally, according to the Library records, "there has been no formal request made in a timely manner by any of the [p]laintiffs . . . to conduct a program at the Library, which is different from a request for use of a meeting room."[41]

The defendants argue that the plaintiffs lack standing for failure to establish an injury-in-fact or that any alleged injury is fairly traceable to these defendants or likely to be redressed by a favorable decision in this case. Furthermore, the defendants assert that the plaintiffs have failed to establish taxpayer standing, particularly given that all allegations of taxes paid pertain to sales tax rather than property tax, and sales taxes "do not provide a source of income for the Library."[42] Assuming, for purposes of the standing argument only, that Secular Humanism and/or LGBTQ ideology constitute religion within the meaning of the Establishment Clause, the defendants argue that the plaintiffs cannot establish standing for lack of a direct and personal injury or any evidence that they have altered their behavior as a result of the DQSH.

---

[40] Rec. Doc. 118-1, pp. 2-3.
[41] Rec. Doc. 118-1, p. 2.
[42] Rec. Doc. 118, p. 13.

# LAW AND ANALYSIS

## A.   RULE 12(B)(1) STANDARD

Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) require a court to dismiss claims over which the court lacks subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[43] "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."[44] "This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice."[45]

"Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction–its very power to hear the case–there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[46] That said, "a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of

---

[43] *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2nd Cir. 1996)).

[44] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)).

[45] *Valentine v. L & L Sandblasting, Inc. Corp.*, No. 6:15-2905, 2016 WL 5724970, at *2 (W.D. La. May 9, 2016), *report and recommendation adopted*, No. 6:15-2905, 2016 WL 5794551 (W.D. La. Sept. 30, 2016) (citing *Ramming*, 281 F.3d at 161).

[46] *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981) (quoting *Mortensen v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3rd Cir. 1977)).

facts in support of his claim that would entitle plaintiff to relief."[47] "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[48] "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."[49] "Accordingly, the plaintiff[s] constantly bear[] the burden of proof that jurisdiction does in fact exist."[50]

### 1. Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."[51] "There is no case or controversy without standing to sue."[52] "Standing is a threshold issue that [the court] consider[s] before examining the merits."[53] Importantly, "[s]tanding to sue must be *proven*, not merely asserted, in order to provide a concrete case or controversy and to confine the courts' rulings within our proper judicial sphere."[54]

---

[47] *Ramming,* 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.*, 143 F.3d at 1010).

[48] *Id.* (citing *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

[49] *Ramming,* 281 F.3d at 161 (citation omitted).

[50] *Id.* (citing *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980)).

[51] U.S. Const., Art. III, § 2.

[52] *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

[53] *Id.* (citing *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013)).

[54] *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496–97 (5th Cir. 2007) (en banc) (emphasis added).

As the Supreme Court has explained, "standing 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.'"[55] "In order to have standing to assert federal jurisdiction, a plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'"[56] Thus, "[t]o establish standing, a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury."[57] "To satisfy the injury-in-fact requirement, a plaintiff must allege an injury that is 'actual or imminent, not conjectural or hypothetical.'"[58] "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"[59] Absent a showing of these three required elements, "exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art[icle] III limitation [of federal court jurisdiction to actual cases or controversies]."[60]

---

[55] *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)).

[56] *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 424 (5th Cir. 2013) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks and citation omitted)).

[57] *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[58] *Cruz v. Abbott*, 849 F.3d 594, 598 (5th Cir. 2017) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted)).

[59] *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1548 (2016), as revised (May 24, 2016) (citations omitted).

[60] *Simon*, 426 U.S. at 38.

Because it is jurisdictional, "[p]laintiffs always have the burden to establish standing."[61] "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation."[62] Should the Court determine that the plaintiffs lack standing, "[i]t follows that '[it does] not—indeed, [it] may not—reach the merits of the parties' [constitutional] arguments.'"[63]

### a.  Standing Requirement in Establishment Clause Cases

"The Establishment Clause is no exception to the requirement of standing."[64] "It is not enough simply to argue that there has been some violation of the Establishment Clause; [the plaintiffs] must allege a personal violation of rights."[65] "Although 'the concept of injury for standing purposes is particularly elusive in Establishment Clause cases,'"[66] the Fifth Circuit has recently recognized that courts

---

[61] *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 652 (2018), and *cert. denied sub nom. Campaign for S. Equal. v. Bryant*, 138 S. Ct. 671 (2018) (citing *Lujan*, 504 U.S. at 561).

[62] *Id.*

[63] *Barber*, 860 F.3d at 352 (quoting *Hotze v. Burwell*, 784 F.3d 984, 991 (5th Cir. 2015)).

[64] *Id.* at 352-53 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982) (abrogated on other grounds by *Bowen v. Kendrick*, 487 U.S. 589 (1988))).

[65] *Barber*, 860 F.3d at 353 (quoting *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009)).

[66] *Murray v. City of Austin, Tex.*, 947 F.2d 147, 151 (5th Cir. 1991) (quoting *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987) (citation omitted)).

"are not without guidance" in discussing the standing requirement as it relates to various types of Establishment Clause cases, as follows:

> In cases involving religious displays and exercises, we have required an **encounter** with the offending item or action to confer standing. But these religious display and exercise cases represent the outer limits of where we can find these otherwise elusive Establishment Clause injuries. Where a statute or government policy is at issue, the policy must have **some concrete applicability to the plaintiff**. Taxpayers have standing for the limited purpose of challenging a **direct** spending program that implicates the restrictions of the Establishment Clause.[67]

And, "outside the distinct context of the religious display and prayer cases," the Fifth Circuit acknowledged that plaintiffs have not shown injury-in-fact "[w]hen plaintiffs are not themselves affected by a government action *except through their abstract offense at the message allegedly conveyed by that action*[.]"[68] Regardless of which category a particular case may implicate, the emboldened portion of the above-quoted language indicates the importance of alleging "a *personal* violation of rights," in order for an Establishment Clause plaintiff to establish standing to sue.[69]

To clarify, it is well-established that injury to interests of a spiritual nature *can* suffice to establish an injury-in-fact for purposes of Article III standing.[70] Nonetheless, "[e]ven though the injury is spiritual in nature, the injury also must be

---

[67] *Barber*, 860 F.3d at 353 (internal citations and footnote omitted) (emphasis added).

[68] *Id*. at 353 n.4 (emphasis added) (quoting *Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy)*, 534 F.3d 756, 764–65 (D.C. Cir. 2008)).

[69] *Barber*, 860 F.3d at 353 (emphasis added) (quoting *Croft*, 562 F.3d at 745).

[70] *See, e.g., Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause . . . ."); .

*direct* and *personal* to the particular plaintiff."[71] The Supreme Court addressed this point in *Valley Forge*, where plaintiffs brought an Establishment Clause challenge to a transfer of land, with which the plaintiffs had no direct connection, from the federal government to a religious organization. The plaintiffs argued "that any person asserting an Establishment Clause violation possesses a 'spiritual stake' sufficient to confer standing."[72] However, the Supreme Court rejected this broad sweep and held that the plaintiffs "fail[ed] to identify any *personal* injury suffered by them as a consequence of the alleged constitutional error, *other than the psychological consequence presumably produced by observation of conduct with which one disagrees*. That is not an injury sufficient to confer standing under Art. III . . . ."[73]

In the face of passionate plaintiffs, "firmly committed to the constitutional principle of separation of church and state," *Valley Forge* further emphasized that "standing is not measured by the intensity of the litigant's interest or the fervor of

---

[71] *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1066 (9th Cir. 2010) (en banc) (Graber, J., dissenting on the issue of jurisdiction but concurring in the judgment) (emphasis in original); *see also Doremus v. Board of Ed. of Borough of Hawthorne*, 342 U.S. 429, 434-35 (1952).

[72] *Valley Forge*, 454 U.S. at 486 n.22.

[73] *Id.* at 485 (emphasis added). In so holding, the Supreme Court distinguished the case relied on by the plaintiffs to support their "spiritual stake" argument, *Abington School District v. Schempp*, 374 U.S. 203 (1963), explaining: "The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause—for as *Doremus* demonstrated, that is insufficient—but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them. Respondents have alleged no comparable injury." *Valley Forge*, 454 U.S. 486 n.22.

his advocacy."[74] Instead, as explained above, "at an irreducible minimum, Art[icle] III requires the [plaintiff] to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant'. . . ."[75] Requiring a plaintiff to "'allege facts showing that he is himself adversely affected . . . [serves in part] to put the decision as to whether review will be sought in the hands of those who have a *direct* stake in the outcome.'"[76] "The requirement of a direct and personal injury in part 'reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order.'"[77]

## B.    THE PLAINTIFFS HAVE FAILED TO ESTABLISH STANDING

### 1. Plaintiffs have failed to establish taxpayer standing.

As recognized above, the plaintiffs rely heavily on their status as taxpayers, or payers of sales tax, in order to establish standing; therefore, that argument is addressed first. They argue that "[b]ecause the [p]laintiffs or their authorized agents are card carrying members of the Library and because they pay sale[s] tax in the city on an ongoing basis, they have enough to assert taxpayer standing."[78] The plaintiffs broadly assert that they "pay and continue to pay all types of taxes in the State of

---

[74] *Valley Forge*, 454 U.S. at 486.
[75] *Id.* at 472 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)); *see also Lujan*, 504 U.S. at 560 & n. 1 (holding that an "injury in fact" "must affect the plaintiff in a *personal and individual* way" (emphasis added)).
[76] *Id.* at 473 (emphasis added) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972))
[77] *Catholic League*, 624 F.3d at 1066 (quoting *Valley Forge*, 454 U.S. at 473).
[78] Rec. Doc. 114, p. 16.

Louisiana and to Lafayette Parish[,]"[79] and the Library is a "public taxpayer funded facility . . . with librarians whose salaries are paid for by the taxpayers[.]"[80] On that premise, they assert that they "do not want the Library or the city to use their tax dollars to pay for, promote, host, and sponsor the [DQSH] because it causes the Plaintiffs to feel coerced by the simple act of paying taxes."[81]

"Absent special circumstances, . . . standing cannot be based on a plaintiff's mere status as a taxpayer."[82] The Supreme Court "has rejected the general proposition that an individual who has paid taxes has a 'continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution.'"[83] This is because "state taxpayers, like federal taxpayers, ordinarily lack a sufficient personal stake to challenge laws of general applicability, since their own injury is not distinct from that suffered by taxpayers in general."[84] "This precept has been referred to as the rule against taxpayer standing."[85]

The Supreme Court considered the general rule against taxpayer standing in connection with an alleged Establishment Clause violation in *Doremus v. Board of*

---

[79] Rec. Doc. 93, p. 15, ¶ 20.
[80] Rec. Doc. 114, pp. 23 and 15-19.
[81] Rec. Doc. 93, p. 16.
[82] *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011).
[83] *Id.* (quoting *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 599 (2007) (plurality opinion)).
[84] *Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir. 2002) (citations omitted).
[85] *Arizona Christian*, 563 U.S. at 134.

*Ed. of Borough of Hawthorne*, 342 U.S. 429 (1952), in which a plaintiff relied on her status as a taxpayer to challenge a New Jersey statute providing that public schoolteachers would read Bible verses to their students each morning. There were two *Doremus* plaintiffs, attempting to challenge the statute in two capacities—"one as parent of a child subject to it, and both as taxpayers burdened because of its requirements."[86] "There [wa]s no assertion that [the student] was injured or even offended thereby or that she was compelled to accept, approve or confess agreement with any dogma or creed or even to listen when the Scriptures were read[;]" to the contrary, it was stipulated that "any student, at his own or his parents' request, could be excused during Bible reading and that in [*Doremus*] no such excuse was asked."[87]

Finding that the plaintiffs lacked standing to sue, the Supreme Court reiterated that a plaintiff "must be able to show . . . that he has sustained or is immediately in danger of sustaining some *direct* injury . . . and not merely that he suffers in [s]ome indefinite way in common with people generally."[88] *Doremus* explained that a "taxpayer's action can meet this test, but only when it is a good-faith pocketbook action[,]" involving "a direct dollars-and-cents injury" rather than just "a religious difference."[89] Of course, "it would not matter that [a plaintiff's] dominant

---

[86] *Doremus*, 342 U.S. at 432.

[87] *Id.*

[88] *Doremus*, 342 U.S. at 434 (emphasis added) (citation and quotation marks omitted); *see also Arizona Christian*, 563 U.S. at 134.

[89] *Id.* at 434.

inducement to action was more religious than mercenary[,]" if that plaintiff "established the requisite special injury necessary to a taxpayer's case or controversy[.]"[90] Indeed, "[i]t is not a question of motivation but of possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct."[91]

Here, the plaintiffs have failed to show that this suit involves "a direct dollars-and-cents injury" rather than just "a religious [or ideological] difference."[92] The plaintiffs allege taxpayer standing based on their alleged payment of sales tax, both "through their use of the Library" and throughout Lafayette generally. However, the defendants have established that sales tax proceeds do not fund the Library. Instead, the Library is 98% funded by ad valorem, or property, taxes collected across three parishes, with the remaining 2% of funding coming from fines, print revenues and donations. There is no allegation, much less any evidence to show, that any of these three plaintiffs are property owners who pay property taxes in Lafayette Parish. Moreover, there is no indication that these plaintiffs possess "the requisite financial interest that is, or is threatened to be, injured" by the Library hosting DQSH, given that the plaintiffs have failed to show that DQSH would increase the costs of running the Library or that the plaintiffs would be forced to pay a tax to support any alleged

---

[90] *Id.* at 434-35.
[91] *Id.* at 435.
[92] *Id.* at 434.

expenditure.[93] Indeed, the defendants have established that the DQSH, at the time it was originally planned, was to be held at no cost to the Library, as librarians working the DQSH would do so within their regularly scheduled workdays, and books that were to be read were either already part of the Library's collection or were scheduled to be acquired regardless of the DQSH.[94] As recognized herein, "[t]axpayers have standing for the *limited* purpose of challenging a direct spending program that implicates the restrictions of the Establishment Clause."[95] These plaintiffs have failed to establish standing based on any alleged taxpayer status.[96]

### 2. Plaintiffs have failed to establish traditional standing.

Aside from pure taxpayer standing, the plaintiffs argue that they have standing because they: have library cards; use the Library to borrow books, rent materials, write tax legislation, and pay for printing and late fees; have set up and attended meetings at the Library; have been exposed to, and offended by, DQSH promotional materials and media; have filed formal complaints against the DQSH, pursuant to

---

[93] *See id.* at 435.

[94] *See* Rec. Doc. 118, p. 13.

[95] *Barber*, 860 F.3d at 353 (emphasis added) (citing *Flast*, 392 U.S. at 102-03).

[96] As recognized above, the plaintiffs also claim to be "'super tax payers,' with an 'extra' logical nexus to the Library because they are part of a lobbying team that writes tax legislation for [Louisiana,]" some of which "will generate millions of dollars annually," and they do not want the tax dollars that they pay or generate to go "towards the Library's partnership, endorsement, promotion, and authorization of [DQSH] for children." Rec. Doc. 114, p. 17. Aside from alleging that they sometimes use the Library's facilities to carry out their legislative efforts, the plaintiffs have failed to establish any basis upon which these alleged facts are in any way relevant to, or might tend to establish, their standing to bring this lawsuit.

Library guidelines; and are personally offended by the Library's endorsement and sponsorship of the DQSH, which they find "offensive," because it "elevate[s] the religion of Secular Humanism over non-religion."[97] They claim to have suffered an "injury in fact," because "they intend to continue to use the Library and the Library intends to regularly sponsor the event with its stamp of approval at the taxpayers' expense."[98] Weaving in their other contentions, the plaintiffs essentially argue that, merely by using the Library, they have shown injury-in-fact, due to their resultant, continued exposure to the Library's offensive promotion, endorsement, and sponsorship of the DQSH.

Based on the cases cited by the plaintiffs, they are attempting to analogize their purported injury to the injuries at issue in the religious-display and religious-exercise cases, both of which "require the same type of personal confrontation" for a plaintiff to establish standing.[99] It is worth repeating that the DQSH has not occurred, and therefore, the plaintiffs have not "encounter[ed] [] the offending item or action," in the traditional sense, as is "required" to confer standing in such cases.[100] In that way, this case is analogous to *Tangipahoa Parish*, in which the Fifth Circuit confirmed that standing to challenge invocations as violating the

---

[97] Rec. Doc. 114, pp. 13 and 15-16; Rec. Doc. 116, pp. 7-9.
[98] Rec. Doc. 114, p. 14.
[99] *Barber*, 860 F.3d at 353-54.
[100] *Id.* at 353 (citing *Tangipahoa Parish*, 494 F.3d at 497).

Establishment Clause may not be "based solely on injury arising from mere abstract knowledge that invocations were said."[101] Even though the plaintiffs have not and cannot allege that they were forced unto unwelcome contact with DQSH itself, they rely on cases involving religious displays and exercises to establish standing.

For example, the plaintiffs cite *Staley v. Harris County, Tex.*, in which a plaintiff-attorney claimed Article III standing to challenge the display of a Bible in a monument located on courthouse grounds, because she passed the monument going to and from the courthouse in the course of her occupation.[102] Although, in *Staley*, "standing dissipate[d]"[103] for lack of injury after the monument was placed in a warehouse, the plaintiffs analogize the *Staley* plaintiff's regular contact with the monument to their desire not to "come into unwelcomed contact with [DQSH,] . . . because they have been victimized by devout Secular Humanists and because the LGBTQ church's ideology is patently offensive, indecent, and implausible."[104] Similarly, the plaintiffs cite *Suhre v. Haywood County*, in which the Fourth Circuit

---

[101] *Tangipahoa Parish*, 494 F.3d at 497.

[102] *Staley v. Harris County, Tex.,* 485 F.3d 305 (5th Cir. 2007) (en banc).

[103] *Barber*, 860 F.3d at 353-54 (citing *Staley*, 485 F.3d at 309).

[104] Rec. Doc. 114, pp. 13-14. The plaintiffs also rely on *North Carolina Civil Liberties Union v. Constangy*, 751 F.Supp. 552, 553 (W.D.N.C. 1990), in which a federal district court in North Carolina found an Establishment Clause violation in a state judge's practice of opening court sessions with prayer. The decision was affirmed by the Fourth Circuit. *See North Carolina Civil Liberties Union Legal Foundation v. Constangy*, 947 F.2d 1145 (4th Cir. 1991). Although the district court recognized that "[e]ach individual plaintiff has been present for at least one recitation of [the] court-opening prayer," this Court notes that there was no further discussion or analysis of standing in either the district court's, or the Fourth Circuit's, opinion.

held that a citizen had standing to challenge a Ten Commandment display in the county courthouse, given that the citizen *personally* encountered the display "both as a user of the courts and as a participant in local politics and government," and there was evidence of "repeated unwelcome exposure" to the display.[105] Relying on *Suhre*'s directive that "'the spiritual, value-laden beliefs of the plaintiffs' are often most directly affected by an establishment of religion[,]" the plaintiffs claim that they, too, have suffered "such an intangible injury in fact" as that which conferred standing in *Suhre*.[106] These cases, and the principles for which the plaintiffs rely on them, do not establish standing in this case.

Significantly, in order to establish standing, "[t]he personal confrontation must also occur in the course of a plaintiff's regular activities; it cannot be manufactured for the purpose of litigation."[107] Here, it is clear to this Court that any alleged injury, or even any tangential "confrontation" with DQSH-related plans, actions or materials, has been manufactured for the purpose of litigation rather than occurred in the course of any of these plaintiffs' regular activities. As noted above, DQSH was originally scheduled to, and will only ever, take place in a meeting room rather than the commons area of the Library, such that there is no indication that the

---

[105] *Suhre v. Haywood County*, 131 F.3d 1083, 1090-91 (4th Cir. 1997); Rec. Doc. 114, pp. 12-13.
[106] Rec. Doc. 114, pp. 12-13 (quoting *Suhre*, 131 F.3d at 1086 (quoting *ACLU v. Rabun County*, 698 F.2d 1098, 1102 (11th Cir. 1983))).
[107] *Barber*, 860 F.3d at 354 (citing *ACLU–NJ v. Twp. of Wall*, 246 F.3d 258, 266 (3d Cir. 2001)).

plaintiffs will "come into unwelcome contact" with DQSH during the course of regularly using the Library. In addition, it is dubious whether these plaintiffs, in fact, use the Library in the course of their *regular* activities. The plaintiffs only recently obtained library cards; Mr. Guidry, two days before this lawsuit was filed, and Mr. Sevier, one month later during the pendency of this lawsuit. Likewise, it was only after DQSH was planned, and this lawsuit was filed, that the plaintiffs attempted to reserve a meeting room for their own purposes at the Library, and it is undisputed that said request was granted. Not only does a review of this record indicate that any confrontation has been manufactured for litigation, but a string of similar cases filed in other jurisdictions, with overlapping plaintiffs and arguments, also supports that conclusion.[108]

Although the plaintiffs cannot establish standing for lack of injury, they have also separately failed to establish that any purported injury is traceable to the defendants' conduct or likely to be redressed by a favorable judicial decision.[109]

---

[108] *See*, *e.g.*, *Christopher et al v. Lawson et al,* 4:18-cv-3943-LHR, (S.D. Tex. Jan. 3, 2019) ("The plaintiffs are using this case–and similar cases filed in other jurisdictions –to protest the gay-rights movement and the legal rights federal courts have recognized for members of the LGBTQ community."); *Sevier v. Thompson et al,* 2:16-cv-00659-DN (D. Utah Mar. 16, 2018); *Goodspeed et al v. Wyoming Governor et al,* 2:18-cv-00019-NDF (D. Wyo. Feb. 1, 2018); *Sevier v. Davis et al,* 0:16-cv-00080-HRW (E.D. Ky. Mar. 31, 2017); *Sevier v. Abbott et al,* 4:16-cv-00347 (S.D. Tex. June 8, 2016); *Penkoski et al v. Justice et al,* 1:18-cv-00010-IMK-MJA (N.D. W. Va. Nov. 9, 2018); *Harley et al v. Abbott et al,* 3:17-cv-03073-L (N.D. Tex. Feb. 23, 2018); *Gunter et al v. Bryant et al,* 3:17-cv-00177-NBB-RP (N.D. Miss. Aug. 1, 2018); *Kohl et al v. Hutchinson et al,* 4:17-cv-00598-KGB (Sept. 7, 2018); *Sevier et al v. Ivey et al,* 2:17-cv-01473-MHH (N.D. Ala. Apr. 30, 2018).

[109] *Biological Diversity*, 704 F.3d at 424; *Lujan*, 504 U.S. at 560-61.

Based on the plaintiffs' own filings, their concerns are not limited or fairly traceable to this Library's involvement with DQSH but rather extend broadly to any perceived endorsement of "LGBTQ ideology" or Secular Humanism, which the plaintiffs find offensive and dangerous. For example, they want to avoid "unwelcomed contact with [DQSH,] . . . *because* they have been victimized by devout Secular Humanists and because the LGBTQ church's ideology is patently offensive, indecent, and implausible."[110] As indicated by the string of cases filed in other jurisdictions, of which the above-cited list is only representative and not exhaustive, the plaintiffs' objections extend far wider than any actions of these defendants, such that an order enjoining DQSH is not likely to redress the plaintiffs' purported injury.

## C. LACK OF JURISDICTION PRETERMITS FURTHER ANALYSIS

Finally, in the currently pending motions to dismiss, the defendants assert that this action is also subject to dismissal as frivolous; for failure to state a claim upon which relief may be granted under Rule 12(b)(6); and for insufficient service of process under Rule 12(b)(5).[111] However, where "a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."[112] Indeed, "[f]or a

---

[110] Rec. Doc. 114, pp. 13-14 (emphasis added).
[111] Rec. Docs. 96 and 111.
[112] *Ramming*, 281 F.3d at 161; *Alabama-Coushatta Tribe of Texas v. United States,* 757 F.3d 484, 487 (5th Cir. 2014).

court to pronounce upon [the merits] when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."[113] "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."[114] Accordingly, this Court recommends dismissal for lack of standing, and therefore lack of jurisdiction, and pretermits analysis of any alternative bases for dismissal.

Of course, should the district court disagree with this Court's recommendation, and instead find that the plaintiffs have established standing to sue, this Court will take up the defendants' remaining bases for dismissal on the merits. In the event that such an analysis is necessary in this case, this Court would find persuasive the analysis recently undertaken in *Christopher et al v. Lawson et al*, 4:18-cv-3943-LHR, (S.D. Tex. Jan. 3, 2019), cited herein. There, after finding that the plaintiffs lacked standing, the court proceeded to an alternative analysis of the merits and concluded that "the pleading deficiencies under Rule 12(b)(6) could not be cured by amendment, so dismissal on [that] basis would be with prejudice."[115] As previously acknowledged, *Christopher* is strikingly similar to the instant case; however, there, the Houston Public Library had already hosted two sessions of "Drag

---

[113] *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101–02 (1998).

[114] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[115] *Christopher*, 4:18-cv-3943, Rec. Doc. 64, p. 17.

Queen Storytime" by the time the lawsuit was filed.[116] In that way, *Christopher* was postured differently than the case before this Court, though ultimately not in a legally consequential way.   Accordingly,   this   Court   would   find   *Christopher* indistinguishable in any future analysis of the merits in this case.

<u>C</u><small>ONCLUSION</small>

For the foregoing reasons, this Court recommends that the motions to dismiss [Rec. Docs. 96, 111] be GRANTED insofar as the plaintiffs' claims should be dismissed without prejudice for lack of standing.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual

---

[116] *Id*. at p. 4.

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[117]

Signed at Lafayette, Louisiana on January 10, 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[117] *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).